# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MARCH 25, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0734-MR


RICKY SIMPSON                                                 APPELLANT


V.
              ON APPEAL FROM CASEY CIRCUIT COURT
HONORABLE JUDY DENISE VANCE, JUDGE
NO. 18-CR-00088


COMMONWEALTH OF KENTUCKY                          APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Ricky Simpson appeals as a matter of right[1] from his conviction and 20-year sentence for receiving stolen properly valued at $500 or more, multiple motor vehicle offenses (having no registration receipt, having no registration plate, failure to maintain insurance, driving on a DUI suspended license), and being a first-degree persistent felony offender ("PFO-1"). For the following reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Simpson was convicted of being in possession of a stolen black walnut log from Joseph Chad Wheet's property on White Oak Church Road in Adair County, Kentucky. Evidence was introduced that the approximate value of the

---

[1] Ky. Const. § 110(2)(b).

log was between $1,700 and $3,000. In the spring of 2018, Wheet had entered into an agreement with timber cutter Clifford Jasper to harvest black walnut trees located near a creek on Wheet's property, and the two were to divide the proceeds equally. Because cutting trees next to a waterway is prohibited, Jasper examined them with a forestry official who decided which trees he could cut and marked those trees with orange paint. In May 2018, Jasper cut the trees marked with orange, yarded the logs in the adjacent fields, took bids, and found a buyer.

On the morning of May 22, 2018, the logs were still in Wheet's field. That day, Wheet traveled to Somerset to train for his job as a paramedic. While there, Wheet received a phone call from his neighbor, Mike Schweppe, who informed him that boys were dragging logs from his property up the road with a Dodge truck and loading them onto a green flatbed trailer. Wheet and Schweppe exchange multiple phone calls that morning; during one call, Wheet said that Schweppe identified Simpson as the perpetrator. However, at trial, Schweppe denied saying this.

Wheet called the Adair County 911 center to report the theft, to which Deputy Aaron Rainwater and Sheriff Harrison Moss responded, arrivng at his house shortly thereafter. No one was there, and Deputy Rainwater saw no indication that a log had been dragged onto White Oak Church Road. However, once they drove to intersecting Providence Road, Deputy Rainwater saw deep drag marks in the road that indicated something had been dragged from Wheet's field to the road and up a rise.

2

Wheet called Jasper, who went to his house and observed drag marks leading from a strip of dead grass – where one of the logs had been – up to Providence Road. Jasper had not left those drag marks; he used a skidder to bear the weight of the logs and did not take any of them to Providence Road. Jasper drove to a local sawmill and learned that no one had taken the stolen log there. Jasper knew that nearby Wolford & Wethington Lumber also purchased black walnut logs at the time and believed that whoever stole the log would probably take it there.

Information about the theft and Simpson's likely destination was relayed to law enforcement agencies in adjacent Casey County. Deputy Jeffrey Brown waited off Route 127 for Simpson and stopped his vehicle - a Dodge pickup truck pulling a green utility trailer with a single log on it. Simpson's license plate was expired, his operator's license was suspended, and he had no registration receipt or proof of insurance. He told Deputy Brown that he had cut the log on his friend Stacy's farm in Adair County and asserted that he was in lawful possession of it. He did not know Stacy's last name.

Deputy Rainwater and Sheriff Moss went to the location of the traffic stop; Wheet and Jasper arrived separately. Keith Wolford, of Wolford & Wethington Lumber, was previously notified by Jasper to watch for the log. When Wolford heard about the nearby stop he went there to see if it was Simpson – who had recently asked him what a black walnut would be worth. Jasper identified the log on the trailer by the orange marking he had made, which Deputy Rainwater testified he observed, along with markings on the log

3

where it had been dragged up the road. Though the bark was gone from having been dragged, orange paint remained in the crevices. Deputy Brown arrested Simpson for the motor vehicle offenses, as well as for receiving stolen property, and released the log to Wheet at the scene. Wheet then sold the log to a buyer shortly thereafter.

Before trial, Simpson moved to dismiss the indictment or, in the alternative, to exclude Wheet's testimony in its entirety. Simpson argued that the log was improperly released from state custody to Wheet, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that the photographs Wheet took of the log showing the orange markings were taken in a field after the log was released from custody, thus calling into question whether the log he photographed was the log at issue. Simpson emphasized that the photos taken by the officers at the traffic stop did not show any orange markings on the log, thereby making Wheet's photographs of the log showing the orange markings even more prejudicial. The trial court denied both of Simpson's motions. A one-day jury trial was held; at the close of the Commonwealth's case-in-chief, Simpson renewed his motion to dismiss the indictment, as well as moved for a directed verdict on the charge of receiving stolen property over $500. Again, the trial court denied his motions.

The jury convicted Simpson of receiving stolen property valued at $500 or more (a class D felony), and multiple motor vehicle offenses (having no registration receipt, having no registration plate, failure to maintain insurance, driving on a DUI suspended license). During the penalty phase, the

4

Commonwealth introduced evidence that Simpson had been previously convicted of second-degree manslaughter, second-degree assault, first-degree wanton endangerment, driving under the influence in Russell County, burglary and three counts of theft by unlawful taking in Georgia, burglary of a conveyance in Florida, and two counts of burglary of a dwelling in Florida. The jury determined Simpson was a PFO-1 and fixed his punishment at five years, enhanced to twenty years by virtue of his PFO-1 status. Simpson moved for a new trial, which the trial court denied. This appeal followed.

## II. ANALYSIS

### A. The trial court did not abuse its discretion by allowing Wheet to testify, in admitting his photographs of the log, and in allowing the 911 dispatch call to be played for the jury.

Simpson argues that the trial court should have dismissed the indictment against him or, alternatively, should have excluded Wheet's testimony, including the photographs Wheet took of the log, his mobile cell phone records, and the recording of the 911 dispatch call. Simpson claims that under the "best evidence rule" the Commonwealth was required to introduce the most authentic evidence which was within its power to present, which was the log itself. *Savage v. Three Rivers Med. Ctr.,* 390 S.W.3d 104, 114 (Ky. 2012); KRE[2] 1002 (providing that "[t]o prove the content of a writing, recording, or photograph [e.g. an x-ray], the original writing, recording, or photograph is required, except as otherwise provided in these rules, in other

---

[2] Kentucky Rules of Evidence.

rules adopted by the Kentucky Supreme Court, or by statute[]").  Simpson

further argues that the officers' failure to preserve the log as evidence was a

*Brady* violation, warranting dismissal of the indictment or exclusion of Wheet's

testimony and photographs.[3]

In his motion to exclude, Simpson specifically argued that Wheet had no

personal knowledge of the matters to which he would testify, as required by

KRE 602; the expert testimony exception in KRE 703 did not apply; his

testimony would violate the hearsay prohibitions in KRE 802 and 805; and he

would be unable to authenticate his mobile phone log, thus running afoul of

KRE 901(a).  Simpson avers that the call log should have been authenticated

by the custodian of the business records under KRE 902(11) and that its

admission was highly prejudicial, as it bolstered Wheet's testimony and

impeached Schweppe's testimony, given that the two of them disagreed on who

made the first phone call the morning of May 22, 2018.[4]

---

[3] Simpson further asserts that the trial court should have instructed the jury on missing evidence, however, the record shows he did not request such an instruction. Accordingly, RCr 9.54(2) forecloses our review of this claimed error.  *See Martin v. Commonwealth*, 409 S.W.3d 340, 345 (Ky. 2013) ("RCr 9.54(2) bars palpable error review for unpreserved claims that the trial court erred in the giving or failure to give a specific instruction[]").

[4] Simpson also argues now for the first time that the 911 dispatch recording should have been excluded since it contained inadmissible hearsay.  However, the record shows that defense counsel not only failed to object to the introduction of the 911 dispatch call, but rather insisted on playing the recording in its entirety.  Given counsel's waiver, we will not address this claim of error on appeal.  *See Tackett v. Commonwealth*, 445 S.W.3d 20, 29 (Ky. 2014) (" A party cannot ask a trial court to do something and, when the court does it, complain on appeal that the court erred. . . . When, as here, a party not only forfeits an error by failing to object to the admission of evidence, but specifically waives any objection, the party cannot complain on appeal that the court erroneously admitted that evidence[]").  *See also Jefferson v. Eggemeyer*, 516 S.W.3d 325, 339–40 (Ky. 2017) ("An appellant may not 'feed one can of worms to

6

This Court reviews evidentiary rulings on the admission or exclusion of evidence for an abuse of discretion. *Baker v. Commonwealth,* 545 S.W.3d 267, 275 (Ky. 2018). "'The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Id.* (quoting *Commonwealth. v. English,* 993 S.W.2d 941, 945 (Ky. 1999)).

Regarding Simpson's alleged *Brady* violation, the law is clear that the intentional destruction of exculpatory evidence by the Commonwealth is a Due Process violation requiring "(1) dismissal, (2) exclusion of the Commonwealth's evidence, or (3) an instruction permitting the jury to infer that the missing evidence, if available, would be adverse to the Commonwealth and favorable to the defendant." *Estep v. Commonwealth,* 64 S.W.3d 805, 809 (Ky. 2002). The Due Process Clause is implicated when the Commonwealth destroys or loses exculpatory evidence, the potentially exculpatory nature of that evidence was apparent when it was lost or destroyed, *and the Commonwealth acted in bad faith. Id.* (citing *Collins v. Commonwealth,* 951 S.W.2d 569, 572 (Ky. 1997)). If a due process violation occurs,

> dismissal is only one of several remedies available for such violations. *See, e.g., Sanborn v. Commonwealth,* 754 S.W.2d 534, 540 (Ky. 1988). Other remedies, such as exclusion of evidence or a missing-evidence instruction to the jury, may be appropriate depending on the facts. *Id.* In fact, our law appears to express a preference for missing-evidence instructions, which are used "to cure any Due Process violation attributable to the loss or destruction of exculpatory evidence by a less onerous remedy than dismissal or the suppression of relevant evidence." *Estep v.*

---

the trial judge and another to the appellate court[]'") (internal quotations and citation omitted).

7

*Commonwealth,* 64 S.W.3d 805, 810 (Ky. 2002).

*Swan v. Commonwealth*, 384 S.W.3d 77, 91–92 (Ky. 2012). This Court has explained,

> In *Brady,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Arizona v. Youngblood,* the Supreme Court clarified what a defendant must prove when the government fails to collect or preserve evidence, holding, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In other words, government culpability is irrelevant when the Commonwealth withholds plainly exculpatory evidence, but when the Commonwealth merely fails to collect or preserve evidence, as in the case here, the defendant must prove bad faith. When this Court adopted *Youngblood,* we added that "negligence simply does not rise to the level of bad faith...." *Collins v. Commonwealth*, 951 S.W.2d 569, 573 (Ky. 1997).

*Commonwealth v. Parrish,* 471 S.W.3d 694, 697 (Ky. 2015).

Prior to trial, the court denied Simpson's motions to dismiss and exclude. At trial, Simpson renewed his objection to Wheet's testimony, including introduction of the photographs he took. During the bench conference that followed, the parties did not discuss any case law or rules of evidence; Simpson simply argued that it could not be proven that Wheet photographed the log in question, since the pictures were taken in a field, after the log was released from state custody. In response, the Commonwealth maintained that Wheet took the pictures, he would testify to such and therefore they were admissible,

and that Simpson could cross examine him concerning any authenticity issues he had. The trial court overruled Simpson's objection.

On appeal, the parties dispute whether the log was exculpatory or inculpatory evidence. The Commonwealth argues that the orange marking on the log, as shown in Wheet's photographs and identified at the scene by Jasper, proves that the log came from Wheet's property. Conversely, Simpson asserts that the identity and source of the log was crucial to the Commonwealth's case, and to his defense, and would have exonerated him. He points out that even if he had photos of a stump or other evidence that a walnut log had been cut from Stacy's property, as he claims he did, due to the Commonwealth's release of the log from custody, no log exists for a forester or timber expert to compare.

To show a *Brady* violation, a party must establish bad faith on the part of the government. Here, the record contains no allegation or proof of official animus toward Simpson or of a conscious effort to suppress exculpatory evidence. While the officers' failure to preserve the log as evidence may have been negligent, Simpson has failed to establish that their conduct rose to the level of bad faith. Rather, it appears the consensus at the traffic stop was that the log belonged to Wheet, so officials released it to him.

Furthermore, a review of the record shows that Simpson extensively cross-examined Wheet concerning his photographs of the log - presenting the police photos of all sides of the log, and getting Wheet to admit no orange markings appeared on the log in the police photos. On re-direct, the

9

Commonwealth elicited testimony from Wheet that he texted Schweppe a picture from the traffic stop, which had Simpson in it, and that Schweppe identified him as the person who stole the log. During Deputy Rainwater's testimony, he identified the log and its distinct orange marking from Wheet's photographs. At this point, determining the weight and credibility of the testimony fell in the jury's hands. *Commonwealth v. James*, 586 S.W.3d 717, 721 (Ky. 2019) (citing *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (judging the credibility of a witness and the weight to be given the witness's testimony are purely jury functions)). We have long-recognized that in the exercise of these functions, the jury, as finders of fact, were entitled to believe all or part of any witness's testimony and to discount other parts. *Gillispie v. Commonwealth*, 212 Ky. 472, 474, 279 S.W. 671, 672 (1926). Moreover, the law is clear that "the Commonwealth may prove its case by direct or circumstantial evidence. *James*, 586 S.W.3d at 721. Here, despite the log not being preserved as evidence, the jury could have made reasonable inferences from the presented evidence sufficient to sustain Simpson's conviction.[5]

---

[5] Simpson mentioned the best evidence rule in his motion to dismiss indictment, without citing any case law in support, and wholly failed to discuss the issue on appeal. That said, we note that the best evidence rule largely pertains to documentary evidence, not physical evidence. *See Marcum v. Commonwealth*, 390 S.W.2d 884, 886 (Ky. 1965) (holding that the best evidence rule "requires one to introduce the most authentic evidence which is within the power of one to produce, but in practical application it applies almost exclusively to documentary evidence. It is concerned with the *content* of a written instrument[]") (citations omitted).

Simpson next challenges Wheet's testimony with respect to his account of his phone calls with Schewppe the morning of May 22, 2018 and the introduction of Wheet's mobile phone log from that day into evidence. Wheet testified that he received a call about logs being taken from his property on the morning of May 22, 2018. Initially, he did not know the identity of the caller, but the caller later identified himself in a subsequent call as Schweppe, and said Simpson was the one taking the log but told Wheet that he did not want to become involved in the matter any further.[6] Wheet's testimony impeached Schweppe's, who testified that Wheet was the one who called him first that morning and who denied having identified Simpson as the perpetrator. When presented with the Ebill of Wheet's mobile phone record, Schweppe confirmed his mobile phone number was on that log. During Wheet's testimony, he authenticated the Ebill, confirmed his own number, stated that the phone bill was in his ex-wife's name, she printed the bill for him, and it looked like a fair and accurate representation of his phone bill. The phone log showed that Wheet received a call from Schweppe first that morning.

Before presenting Wheet's testimony, the Commonwealth elicited testimony from Schweppe that Wheet called him first that morning. Schweppe also denied identifying Simpson as the perpetrator. With that KRE 613(a)[7]

---

[6] During his testimony, Schweppe revealed that he was good friends with Simpson's father, that Simpson was dating his niece, and that he, Schweppe, put up a $5,000 cash bond to get Simpson out of jail following his arrest.

[7] KRE 613 provides in part:

(a) Examining witness concerning prior statement. Before other evidence can be offered of the witness having made at another time a different

11

foundation, Wheet's testimony about Schweppe's prior statements was admissible under KRE 801A(a)(1)[8] as a hearsay exception for prior inconsistent statements. As a result, the jury's province was to weigh the testimony and evaluate the credibility of the witnesses.

Regarding the trial court's admission of Wheet's mobile phone log, the law is clear that "[a]uthentication is a foundational requirement or condition precedent to admissibility. Before evidence may be admitted, there must be 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Hall v. Commonwealth*, 468 S.W.3d 814, 831 (Ky. 2015) (quoting KRE 901(a)). "The burden on the proponent of authentication is slight; only a prima facie showing of authenticity is required. . . . This means of course that the trial judge decides only if the evidence can be admitted and the trier of fact determines the authenticity of the evidence and its probative force." *Id.* (citations omitted).

---

statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, if it be in writing, it must be shown to the witness, with opportunity to explain it. The court may allow such evidence to be introduced when it is impossible to comply with this rule because of the absence at the trial or hearing of the witness sought to be contradicted, and when the court finds that the impeaching party has acted in good faith.

[8] KRE 801A(a)(1) provides in part:

(a) Prior statements of witnesses. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is: (1) Inconsistent with the declarant's testimony[.]

12

Simpson does not allege that the mobile phone record was hearsay, he simply claims the custodian of the record (Wheet's ex-wife, Kasey) should have authenticated the EBill pursuant to KRE 902(11) since the phone was in her name and she printed the call log for Wheet. Simpson cites no case law in support of his assertion. Looking to the rules of evidence as guidance, KRE 902(11) provides, in relevant part:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
>
> * * *
>
> (11) Business records.
>
> (A)    Unless the sources of information or other circumstances indicate lack of trustworthiness, the original or a duplicate of a record of regularly conducted activity within the scope of KRE 803(6) or KRE 803(7), which the custodian thereof certifies:
>
> > (i)    Was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
> >
> > (ii)    Is kept in the course of the regularly conducted activity; and
> >
> > (iii)    Was made by the regularly conducted activity as a regular practice.

KRE 901 sets forth methods of authentication, providing in part that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). Under KRE 901(b)(1), a witness with knowledge may testify to this. And under KRE 901(b)(4), "[a]ppearance, contents, substance, internal patterns, or other

13

distinctive characteristics, taken in conjunction with circumstances" may be used to authenticate an item.

Here, Wheet had first-hand knowledge of his mobile phone communications on May 22, 2018. Wheet identified his phone number and recognized the mobile phone bill itself, which he said was a fair and accurate depiction of the Ebill. Wheet explained that in May 2018, the phone was registered in his then wife's name, and she printed the bill for him. He also identified Schweppe's phone number and a number of other numbers on the call log, including the call he made to the Adair County 911 center on May 22, 2018. Under KRE 901(a), Wheet's testimony, in conjunction with the appearance of the phone bill itself, sufficiently authenticated the record. Simpson has not alleged hearsay or any lack of trustworthiness with respect to the Ebill itself, other than it should have been introduced through Kasey, rather than Wheet. Based on the lack of any issues with respect to the trustworthiness of the document, the trial court did not abuse its discretion by allowing the mobile call log to be admitted into evidence through Wheet.

## B. Improper juror contact with the Commonwealth's witnesses did not constitute palpable error.

Prior to the jury being discharged (and before the penalty phase), Simpson brought two instances of alleged juror misconduct to the trial court's attention, claiming that those jurors had ignored the court's admonition not to speak with witnesses. Simpson suggests that the trial court should have sua sponte granted a mistrial, but admits he did not request one, or any other relief from the trial court. Accordingly, he asks us to review his claim for palpable

14

error.  *See Cash v. Commonwealth*, 892 S.W.2d 292, 295 (Ky. 1995) (per RCr 9.22, a party is required to make "known to the court the action he desires the court to take or his objection to the action of the court" and failure to do so renders an error unpreserved).  Notwithstanding the contemporaneous objection rule embodied in RCr 9.22, this Court can consider a "palpable error" which affects the "substantial rights" of a defendant even though the error was insufficiently raised or preserved before the trial court.[9]  *Id.*

Simpson contends that palpable error occurred since no more recognizable right of a defendant exists than the right to be tried before a fair and impartial jury.  Both Section 11 of the Kentucky Constitution and the Sixth Amendment of the United States Constitution guarantee an accused the right to a speedy and public trial "by an impartial jury."  Simpson cites to KRS[10] 29A.310(2), affirming this right: "No officer, party, or witness to an action pending, or his attorney or attorneys shall, without leave of the court, converse with the jury or any member thereof upon any subject after they have been sworn."

---

[9] RCr 10.26 provides: "A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."  "Palpable error relief is available under RCr 10.26 only upon a determination that manifest injustice has resulted from the error.  Manifest injustice is error [that] so seriously affect[s] the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable."  *Davidson v. Commonwealth*, 548 S.W.3d 255, 261 (Ky. 2018) (internal quotations and citations omitted).

[10] Kentucky Revised Statutes.

This Court has distinguished between innocent conversations in which matters of substance are not involved and conversations which prejudice the defendant to the extent he is deprived of a fair trial. *Oro-Jimenez v. Commonwealth*, 412 S.W.3d 174, 180–81 (Ky. 2013).

> The true test is whether the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. Kentucky courts have generally drawn a bright line between conversations between jurors and witnesses about the case and those which are about unrelated matters. The former prejudice the defendant, whereas the latter are harmless.

*Id.* at 181 (internal quotations and citations omitted).

Simpson's first alleged instance of juror misconduct concerns a juror who had a conversation with Detective Dennis Allen during one of the breaks. When questioned by the trial court about this encounter, the juror stated that he thought he recognized Det. Allen and as he was walking out the courtroom door, he commented to him that he thought he knew him. That was the extent of their interaction. Det. Allen did not testify during the trial but was introduced to the jury at the beginning of the trial while being seated at the prosecutor's table. Nevertheless, the trial court's questioning of this juror revealed that the juror did not discuss this case or any case-related matter with Det. Allen and did not intentionally fail to disclose during voir dire a connection of which the juror was aware. Rather, the juror simply realized he may know Det. Allen and sought to confirm it. At this point, the trial court asked counsel if "we were good" to which they both responded affirmatively. Defense counsel requested no further relief.

16

While the contact between Det. Allen and this juror violated KRS 29A.310(2), the interaction was harmless and certainly did not rise to the level of palpable error. *See id.* (Although violative of KRS 29A.310(2), the conversation between a juror and a witness was innocent, was not calculated by either the juror or the witness to corrupt the proceeding in any way, it involved no improper exchange of information material to the case, nor did it otherwise reveal the presence of an improper influence that might have affected the verdict.); *Talbott v. Commonwealth*, 968 S.W.2d 76, 86 (Ky. 1998) (While three jurors engaged in separate conversations with a witness for the Commonwealth (the sheriff) during trial recesses in violation of KRS 29A.310(2), none of the conversations related to the trial and were found to be harmless.)

Simpson's second instance of alleged juror misconduct was also harmless error. In that instance, a spectator observed one of the jurors interacting with Deputy Rainwater on the elevator. This spectator informed the court that the juror was already on the elevator and held the door for Deputy Rainwater, insisting that he join him on the elevator. Deputy Rainwater did, and the juror, who is a constable, asked Deputy Rainwater if he knew an individual who lived in Danville, Kentucky. Deputy Rainwater responded that he did. The spectator did not hear the two discuss anything related to this case. When this juror was questioned by the court about this encounter, the juror admitted discussing with Deputy Rainwater an individual the juror was

17

looking for who had warrants for his arrest. The juror denied discussing the case at bar with Deputy Rainwater.

Simpson maintains that this juror's contact with Deputy Rainwater "amounts to a cooperative effort between a juror and an officer" and exhibits a high level of prejudice which affected his right to an impartial jury. Again, while this contact violated KRS 29A.310(2), the brief conversation was harmless and did not amount to palpable error. No mistrial was requested, and none was warranted.

## C. Simpson was not entitled to a directed verdict.

At the close of the Commonwealth's case-in-chief, Simpson moved for a directed verdict on the charge of receiving stolen property over $500.

When reviewing a trial court's ruling on a motion for a directed verdict,

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, we must determine whether, given the evidence as a whole, it would be clearly unreasonable for a jury to find guilt. Only then is a defendant entitled to a directed verdict of acquittal. Further, the Commonwealth need only produce more than a "mere scintilla" of evidence to defeat a defendant's motion for a directed verdict.

*James*, 586 S.W.3d at 721 (internal quotations and citations omitted).

Simpson maintains that a directed verdict in his favor was merited because the Commonwealth relied on circumstantial evidence and hearsay to

18

establish its case. However, as we have discussed, a conviction may be sustained on circumstantial evidence alone. We also have found no merit in Simpson's claims of error with respect to the evidentiary issues he raises.

Further, the evidence was sufficient to send the case to the jury. At Simpson's traffic stop, Jasper identified the log as being one he cut from Wheet's property and pointed out the orange marking. At trial, Deputy Rainwater corroborated Jasper's identification of the orange marking on the log during the traffic stop. The evidence also showed that neither Wheet nor Jasper gave Simpson permission to be in possession of the log. Wheet testified that Schweppe called him the morning of May 22 to report the theft, from an individual driving a Dodge pickup truck and green trailer and said that Schweppe identified Simpson as the perpetrator. Schweppe's phone number appeared on Wheet's mobile call log from that day. Lastly, Simpson was pulled over in a Dodge pickup truck hauling a mostly green trailer with a black walnut log on it, and heading in the direction of Wolford & Wethington Lumber, from whom Simpson had recently inquired as to the value of a black walnut log. The value of the black walnut log was estimated to exceed $500. Based on this evidence, it would not have been clearly unreasonable for a jury to convict Simpson of receiving stolen property over $500. Therefore, the trial court did not abuse its discretion in denying Simpson's motion for a directed verdict.

19

### III. CONCLUSION

For the foregoing reasons, the judgment and sentence of the Casey Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Cameron Cole Griffith
Theodore H. Lavit
Theodore H. Lavit & Associates, P.S.C.

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Kenneth Wayne Riggs
Assistant Attorney General

James Daryl Havey
Assistant Attorney General